1              UNITED STATES DISTRICT COURT FOR THE

2                  WESTERN DISTRICT OF MICHIGAN

3                        SOUTHERN DIVISION

4       UNITED STATES OF AMERICA,

5            Plaintiff,          Case No.: 1:21-cr-00099-JTN

6       v

7       JONATHAN JOSHUA MUNAFO,

8            Defendant.

9       _____/

10                           SENTENCING

11       BEFORE THE HONORABLE JANET T. NEFF, FEDERAL JUDGE

12      Grand Rapids, Michigan - Wednesday, October 26, 2022

13

14      APPEARANCES:

15      For the Government:    Nils R. Kessler, Esq.
                               U.S. Attorney (Grand Rapids)
16                             The Law Bldg, 330 Ionia Ave, N.W.
                               Grand Rapids, MI 49501-0208
17                             (616) 456-2404
                               Nils.Kessler@usdoj.com
18
        For the Defendant:     James Stevenson Fisher, Esq.
19                             Federal Public Defender (Grand
                               Rapids)
20                             50 Louis St., N.W., Ste. 300
                               Grand Rapids, MI 49503-2633
21                             (616) 742-7420
                               james_fisher@fd.org
22
        Reported By:           Annette Blough CRR/CRC/RPR/CSR-5191
23                             Certified Shorthand Reporter
                               (800) 408-0070
24

25

```
 1                           I N D E X

 2
       Examinations                                      Page
 3
 4              NONE

 5

 6
                          E X H I B I T S
 7

 8
       No.    Description              Offered/Admitted Page
 9
10              NONE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     Grand Rapids, Michigan.

2     Wednesday, October 26, 2022 - 11:03 a.m.

3           (On the record at 11:03 a.m.)

4           THE CLERK:  All rise, please.  Hear ye, hear

5     ye, hear ye, the United States District Court for the

6     Western District of Michigan, the Honorable Janet T.

7     Neff, United States District Judge presiding.  All

8     persons having business before the Court, draw near, give

9     attention, and you shall be heard.

10          God save the United States and this Honorable

11    Court.

12          The Court is in session.  You may be seated.

13          THE COURT:  Good morning, everybody.  This is

14    the date and time set for sentencing in Case Number

15    1:21-cr-99, the United States of America versus Jonathan

16    Joshua, is it Munafo?

17          MR. FISHER:  Yes, Your Honor.

18          THE COURT:  Which one?

19          MR. FISHER:  Munafo.

20          THE COURT:  Munafo.  Thank you.  May I have

21    appearances and introductions, please?

22          MR. KESSLER:  Good morning, Your Honor.  Nils

23    Kessler for United States.

24          THE COURT:  Thank you.

25          MR. FISHER:  Good morning, Your Honor.  James

1          Fisher on behalf of Mr. Munafo.

2                    THE COURT:  Thank you.

3                    On May 25, 2022, Mr. Munafo appeared in front

4          of Magistrate Judge Phillip Green and entered a guilty

5          plea to Count One of a Three-Count Indictment.

6                    Count One charges Interstate threatening

7          communications, an offense contrary to 18 USC A75C.  The

8          maximum potential penalties for that offense are five

9          years in prison and a $250,000 fine.

10                   The offense behavior can be fairly summarized

11         as follows:  Mr. Munafo made numerous, threatening phone

12         calls to the Calhoun County Sheriff's dispatch line.  The

13         calls were vulgar, obscene, and included threats of

14         physical harm to the dispatcher and her family.  The

15         Defendant's plea agreement acknowledges that he intended

16         his statements to be threats and he knew they would be

17         taken as such by the dispatcher.  The calls were placed

18         from North Carolina to Michigan.

19                   The Magistrate Judge's report and

20         recommendation was adopted on June 9, 2022.  There is a

21         written plea agreement, which I do accept at this time.

22         And I find that the charge that the Defendant plead to

23         adequately reflects the seriousness of his actual offense

24         behavior.  There's also a written presentence report.

25                   Mr. Kessler, does the Government have any

1          quarrel with the factual recitation in the report?

2                    MR. KESSLER:  No, Your Honor.

3                    THE COURT:  Mr. Fisher?

4                    MR. FISHER:  No, Your Honor.

5                    THE COURT:  Thank you.

6                    Mr. Munafo, a couple of questions for you.

7          Have you read the presentence report?

8                    JONATHAN JOSHUA MUNAFO:  Yes, Your Honor.

9                    THE COURT:  And did you discuss it carefully

10         and thoroughly with your attorney, Mr. Fisher?

11                   JONATHAN JOSHUA MUNAFO:  Very carefully.  Yes,

12         Your Honor.

13                   THE COURT:  And, as you sit in the courtroom

14         this morning, is there anything about the report that you

15         either don't understand or about which you have any

16         question?

17                   JONATHAN JOSHUA MUNAFO:  No, Your Honor.

18                   THE COURT:  Okay.

19                   Now, Mr. Fisher is one of the senior members of

20         the Federal Public Defender's Office in this district.

21         He's well-known to this Court.  I see him regularly.  He

22         has been appointed to represent you at no cost to you.

23         Have you been satisfied with the work that he has done on

24         your behalf?

25                   JONATHAN JOSHUA MUNAFO:  Above and beyond, yes,

1      Your Honor.

2                  THE COURT:  Thank you.

3                  The presentence report includes a calculation

4      of the guidelines, and the guidelines advisory ranges as

5      follows:  The offense level is calculated at 14.  The

6      criminal history category is two based on three criminal

7      history reports, points.  Those two calculations place

8      this case in Zone D of the grid where the incarceration

9      is 18-24 months.  The supervised release range is one to

10     three years.  The fine range is $7,500 to 75,000.

11     Restitution is not an issue here.  And there is a

12     mandatory special assessment of $100.

13                 There is one objection to the scoring.  And

14     that, by the defense, it relates to presentence report

15     Paragraph 30 and guideline 3A1.2A, which concerns the

16     enhancement for the status of the victim as a Government

17     employee.

18                 Mr. Fisher, do you want to put your objections

19     on the record?  I did, obviously, read the presentence

20     report as well as your sentencing memo.  But I'm sure you

21     want to put that on the record.

22                 MR. FISHER:  Thank you, Your Honor.  I'll be

23     brief.

24                 Your Honor, I do admit this is a fairly close

25     case and does hinge on the facts and circumstances of the

1    conduct at issue.  I believe the Government is prepared

2    to attempt to rebut our argument here and support the

3    enhancement.

4             But what I would say is, first of all, we are

5    conceding that this was, by definition, a Government

6    officer.  She fits within the definition.  We don't

7    dispute that.  And probation adequately supported the

8    prong of the enhancement.

9             The issue is whether or not the conduct was

10   motivated by her status.  And I think, referring to the

11   guideline, it says in application note three in the

12   commentary:  Motivated by such status means the offense

13   and conviction was motivated by the fact that the victim

14   was a Government officer or employee.

15            Now, I don't think the facts support that

16   definition here.  Mr. Munafo's call originally was not

17   motivated to harass or intimidate anyone.  He was calling

18   this dispatcher, as I set forth in my objection and my

19   sentencing memo, to report and planned out a video that

20   he had seen on the Internet during a period of time in

21   which he was in a heightened state of mental distress,

22   frankly, for lack of way of describing it, lack of sleep,

23   highly agitated state during this period in his life.

24            After that call was screened to a certain

25   degree by the dispatch caller, he became irate, not

1      because of the fact that this person was a Government

2      employee, thwarting his attempt to speak with a law

3      enforcement officer, but because of how he perceived the

4      call, the receiver, the victim in this case, to be

5      interacting with him.  And I think that is clear from the

6      audio recordings that I've listened to and the transcript

7      that I received.  And the overall tenor of his

8      conversation is based upon his incorrect assessment of

9      what was happening in terms of his interaction with the

10     dispatch person on the other end of the phone.

11            I think that differentiates this from cases

12     where the enhancement is more commonly employed.  And I

13     think the example the Government cites and the example in

14     the application note talks about if somebody kidnaps a

15     person for ransom and they can't claim, for example, that

16     they just did it for the money, in that case the person

17     is being kidnapped because they are a Government

18     employee, not just because they are a person.  I think

19     these are differentiating factors here that Mr. Munafo's

20     conduct was not -- the reason for his conduct was not the

21     identity of this person.  That's where I think the

22     objection hinges on that word motivated by.

23            And the definition I have for motivation is

24     that it was a reason for his behavior.  I don't think the

25     reason here was because of this person's employment.  It

1        was because of his perception of the conduct of the

2        person towards him and the offense that he took,

3        disproportionate to any possible offense, but the offense

4        that he took at her filtration of his call.

5                    THE COURT:  Thank you, Mr. Fisher.

6                    MR. FISHER:  Thank you, Your Honor.

7                    THE COURT:  Mr. Kessler?

8                    MR. KESSLER:  Yes, Your Honor.

9                    Just to take the guideline argument first under

10       the application of 3A1.2, the rule, that is correct, does

11       have two parts to it.  First, that there was a Government

12       employee.  And, second, that the Defendant was motivated

13       by that status.

14                   If you look at the actual exception to that

15       rule, it's for private disputes.  That's not what we have

16       here.  What they have in mind, the example that's

17       actually cited in there is two postal employees get into

18       a fight in the Post Office.  It's not because of their

19       status as postal employees.  Or, for example, if my

20       neighbor were to know I'm a prosecutor but threatened me

21       because my dog is barking in the middle of the night,

22       it's not because I'm a prosecutor.

23                   In this case it's clear that he deliberately

24       did this because he wanted to harass law enforcement.  I

25       have a couple of quick exhibits that I would like to play

1    for the Court for two purposes.  First off, they deal

2    with this particular issue.  I think you can tell when

3    you actually hear them, much more so than when you see

4    them on the page, what the motive was.

5              And, second, I think they go to the 3553A

6    factor, which I will argue later, that the nature and

7    circumstances of the offense.  Just to hear it yourself,

8    I think, is important.  It's a total of four minutes,

9    Your Honor, to hear them all.

10             The first one you can tell that he is

11   deliberately calling the Calhoun County Sheriff's Office,

12   that is why I selected that.  The second one you will

13   hear the threat itself.  And you will hear him talking

14   about the Insurrection Act, which is inextricably tied

15   into his motive, which we see the very next day.  The

16   third one is him taunting them.  And by this point we are

17   three hours deep into him calling, 143 calls deep, and he

18   is still calling them because they are a law enforcement

19   agency.  That is clear in what he says during the

20   taunting.  And then the fourth thing is I would just show

21   you some pictures from the District of Columbia's

22   complaint that just actually show him assaulting law

23   enforcement officers less than 24 hours later, which is

24   tied into this Insurrection Act motivation that he had.

25             So, with your permission, I would go ahead and

1          play those, Your Honor.

2                    THE COURT:  Please do.

3                    MR. KESSLER:  I did prepare a transcript just

4          to make is easier to follow along, although I think it's

5          pretty clear, if I can approach.

6                    THE COURT:  Thank you.

7                    MR. KESSLER:  And that beeping we heard is my

8          computer timing out, so.

9                    This first recording that we will hear, and all

10         of them, you will hear the date and time at the very

11         beginning.

12                   (Recording begins at 11:14 a.m.)

13                   January 5, 2021.  6:49:17 p.m.

14                   DISPATCHER:  Calhoun County Dispatch.

15                   JONATHAN JOSHUA MUNAFO:  Hi, I'd like to speak

16         with an on-duty officer or sergeant, please.

17                   DISPATCHER:  Okay, for what department?

18                   JONATHAN JOSHUA MUNAFO:  I'm sorry?

19                   DISPATCHER:  For what department?

20                   JONATHAN JOSHUA MUNAFO:  The Sheriff's

21         Department.

22                   DISPATCHER:  Okay, what's going on?

23                   JONATHAN JOSHUA MUNAFO:  Na, I'd like to speak

24         with a police officer or a sergeant on duty, please.

25                   DISPATCHER:  I heard what you said, but I'm

```
1         asking you what it's in, um, what it's for.

2                   JONATHAN JOSHUA MUNAFO:  With who am I

3         speaking?

4                   DISPATCHER:  My badge number is 58317.

5                   JONATHAN JOSHUA MUNAFO:  Who are you?  Uh-huh.

6         And?  I don't know who I'm talking to.  I want to speak

7         to a police officer.

8                   DISPATCHER:  Okay.  Well, the police officers

9         are not in the dispatch center, so can I help you with

10        something specific?

11                  JONATHAN JOSHUA MUNAFO:  You can take my name

12        and number and have them call me back is what you can do

13        and lose the attitude as well.  It's not necessary and

14        it's unbecoming of your department.

15                  DISPATCHER:  Sure.  Okay, what is your name?

16                  JONATHAN JOSHUA MUNAFO:  It's Yankee,

17        Y-A-N-K-E-E; last name is Patriot, P-A-T-R-I-O-T.

18                  DISPATCHER:  Your name is Yankee Patriot?

19                  JONATHAN JOSHUA MUNAFO:  That is the name I'm

20        providing you.  Are you questioning my...are you

21        questioning me?

22                  DISPATCHER:  Okay, and what's your phone

23        number?

24                  JONATHAN JOSHUA MUNAFO:  You have a bad

25        attitude, lady.
```

1               DISPATCHER:  And what's your phone number?

2               JONATHAN JOSHUA MUNAFO:  Your shield number

3       again for me?  I know this is a recorded line but.

4               DISPATCHER:  I don't have a shield number.  I

5       have a badge number.  It's 58317.

6               JONATHAN JOSHUA MUNAFO:  What is the difference

7       between a shield and a badge?  I'm sorry.

8               DISPATCHER:  I don't carry a shield.  I'm a

9       dispatcher, sir.

10              JONATHAN JOSHUA MUNAFO:  Ah, that's what I

11      figured.  That is why I'm calling to speak with a police

12      officer that is on duty.

13              DISPATCHER:  Okay, well, police officers don't

14      sit in the dispatch center, sir.  Can I have your phone

15      number, please?

16              JONATHAN JOSHUA MUNAFO:  When I'm speaking,

17      you're not going to interrupt me.  Do you understand me?

18              DISPATCHER:  Can I have your phone number,

19      please?

20              JONATHAN JOSHUA MUNAFO:  When I'm speaking, you

21      don't get the chance to speak.

22              (Recording concludes at 11:16 a.m.)

23              MR. KESSLER:  This next call I'm going to play,

24      Your Honor, illustrates, again, he knows that he is

25      calling the Calhoun County Dispatch Center and he begins

```
1              taunting them by virtue of their being a police agency.
2                        (Recording begins at 11:16 a.m.)
3                        January 5, 2021.  7:26:47 p.m.
4                        SUPERVISOR:  Calhoun County Dispatch.
5                        JONATHAN JOSHUA MUNAFO:  You're putting
6       people's lives in jeopardy by me tying up the line.  Put
7       the fucking cop on the phone, now!
8                        SUPERVISOR:  This is an administrative line,
9       sir.
10                       JONATHAN JOSHUA MUNAFO:  Put the fucking cop on
11      the phone, now!
12                       SUPERVISOR:  I will not allow you to speak to
13      me that way.  Good-bye.
14                       JONATHAN JOSHUA MUNAFO:  Put a cop on the line,
15      or I, I am not gonna stop calling.
16                       SUPERVISOR:  You will stop calling, sir.
17                       JONATHAN JOSHUA MUNAFO:  I fucking guarantee
18      you I won't.
19                       SUPERVISOR:  Okay.  Well, I mean, there are
20      ways we can take care of things.
21                       JONATHAN JOSHUA MUNAFO:  Oh, yeah.  Go ahead,
22      ping me!  Find me!  You don't know where in the fuck in
23      the county I am.
24                       SUPERVISOR:  That's okay.
25                       JONATHAN JOSHUA MUNAFO:  Ma'am, put a fucking
```

```
1          cop on the phone now, you stupid bitch, or it's gonna go

2          way worse for your family.  I'm not joking.  This is not

3          some bullshit call.

4                    SUPERVISOR:  Don't make threats to me on this

5          line, sir.

6                    JONATHAN JOSHUA MUNAFO:  Hey, hey, lady, I'm

7          telling you.  This isn't a threat.  It's a fucking

8          promise.  You are putting people's lives in jeopardy.

9          Put a fucking cop on the phone, now!

10                   SUPERVISOR:  There are no officers in the

11         dispatch center.  We've explained that to you.

12                   JONATHAN JOSHUA MUNAFO:  Lie!  Then you put me

13         on hold for nine minutes, why?  Why?

14                   SUPERVISOR:  Trying to get a hold of the

15         sergeant.  And we have other 911, sir.

16                   JONATHAN JOSHUA MUNAFO:  You haven't picked up

17         the phone.

18                   SUPERVISOR:  Sir, sir, sir.

19                   JONATHAN JOSHUA MUNAFO:  You stupid bitch.

20                   SUPERVISOR:  Sir.

21                   JONATHAN JOSHUA MUNAFO:  I'm gonna make you eat

22         your fucking nose.  I'm gonna hurt you bad for this.  It

23         won't be today.  It won't be tomorrow.  It'll be fucking

24         soon, though, you stupid cunt.  Insurrection Act?  I'm

25         coming to your door first.
```

1              (Recording concludes at 11:18 a.m.)

2              MR. KESSLER:  And finally, Your Honor, in the

3    last call, which is very brief, this is the last one of

4    the 143, and it's three hours later, you can see that he

5    is still doing it for the same reason.

6              (Recording begins at 11:19 a.m.)

7              January 5, 2021.  9:46:59 p.m.

8              SUPERVISOR:  Calhoun County Dispatch.

9              JONATHAN JOSHUA MUNAFO:  Well, now that I'm out

10   of your jurisdiction, and your state, I am definitely not

11   stopping.  So, good luck extraditing my ass for a fucking

12   misdemeanor warrant.  Ha!  During COVID.

13             SUPERVISOR:  Sir, if you don't have an

14   emergency, we are going to disconnect the line.

15             JONATHAN JOSHUA MUNAFO:  I'm disconnecting the

16   line now.

17             (Recording stopped at 11:19 a.m.)

18             MR. KESSLER:  And, finally, Your Honor, I'm

19   going to put up some pictures from the Washington D.C.

20   complaint.  As I mentioned earlier, the acts in this case

21   were all from January 5th.  And on January 6th Mr. Munafo

22   participated in the raid on the capitol in Washington

23   D.C.

24             I'm just going to flip to the page with the

25   pictures.  I will blot this one on the third page.  As

1          you can see from the caption, it says screen shot from

2          the F.B.I.s., be on the lookout video alert for Suspect

3          Number 170, which is Mr. Munafo, posted on YouTube.

4                    These screen shots show Munafo, I'm sorry,

5          Munafo punching a U.S. capitol police officer twice in

6          the head before ripping the officer's riot shield out of

7          his hands.

8                    Show the next one.

9                    THE COURT:  I'm not seeing these, Mr. Kessler.

10                   MR. KESSLER:  They were not showing up, Your

11         Honor?

12                   THE COURT:  No.

13                   MR. KESSLER:  They were when we tried it out

14         before we came in.  Let's see if...

15                   THE COURT:  Here we go.

16                   MR. KESSLER:  Okay.  I will just blow that one

17         up again.

18                   Ready for the next one, Your Honor?

19                   THE COURT:  Yes.

20                   MR. KESSLER:  This one reads figure four and

21         five, two screen shots from open source video, showing

22         Munafo striking the U.S. capitol police officer with a

23         closed fist.

24                   Go to the next page.

25                   Captions at the bottom.  But this first one

1      here that I'm blowing up, you can see Mr. Munafo with his

2      hands on a capitol police officer's shield while the

3      officer is ducking below it.

4            Next one says two screen shots from open source

5      video, showing Munafo pulling the U.S. capitol police

6      riot shield away from the U.S. capitol police officer.

7      Once Munafo succeeded in pulling the riot shield away

8      from the USCP officer, he passed it to others in the

9      crowd behind him.

10            And then the final page I was going to show

11      you, figures eight and nine, a screen shot from open

12      source video showing Munafo circled in red, receiving a

13      flag pole with what appears to be a combination of the

14      flag of the United States and what is known as a Gadsden

15      flag.  There is an example of that.

16            And then the next page or the next picture, a

17      screen shot from open source video showing Munafo holding

18      a flag pole with the U.S. Gadsden flag attached.  And

19      right an image of Munafo striking a window of the capitol

20      with a flag pole.

21            So, Your Honor, to go back to the discussion

22      about 3A1.2, what he is arguing essentially is that this

23      is just a customer service dispute because he wanted

24      service from the 911 dispatcher or the Sheriff's Office

25      Dispatcher.

1           What the first audio shows is he called a

2    Government agency on purpose with the explicit aim of

3    harassing them.  143 calls is really what proves it more

4    than anything.  Obviously, I wasn't going to play all

5    those for the Court.  But one call, maybe two, maybe

6    three; but there is no reason to call 143 times unless

7    your purpose is to taunt them.  And every time he calls

8    he knew he was calling the Calhoun County Sheriff's

9    Department.

10           The fact he said in the second one:  You're

11    putting lives on the line by talking to me, only makes

12    sense in the context of him having a dispute with a

13    Government agency, not a private dispute.  He is

14    leveraging that.  He knows that they need that line

15    cleared in order to help people with actual emergencies.

16    And he is calling them and threatening them with the harm

17    that might come to other people because they aren't

18    giving him what he wants.

19           And then he refers to himself only as Yankee

20    Patriot, and says each call is going to be a charge and

21    says you will never find me.  Again, showing that he knew

22    he was dealing with a law enforcement agency and was

23    deliberately taunting them.

24           And then I think we can't forget the fact that

25    this is January 5th, and the next day he is physically

1       assaulting police for reasons that have to do with the

2       same thing he was taunting Calhoun County about, where he

3       said the Insurrection Act, for example, which is tied up

4       with this whole notion that was driving people to assault

5       law enforcement at the capitol.  The idea that the former

6       president would invoke the Insurrection Act, making them

7       some sort of official militia.

8               And then I think we need to look at what would

9       in a trial context be, 404B, both the fact of what he did

10      after at the capitol and the fact that he did similar

11      things in the past, calling the Massachusetts State

12      Police over and over and over again.  Again, not a

13      customer service dispute.

14              So I think it's pretty clear from all of this

15      that his intent was to harass them and threaten the

16      dispatcher because she was a Government employee.

17              THE COURT:  Thank you, Mr. Kessler.

18              Well, I'm not sure that the photographs are

19      particularly relevant here.  But I also don't see this as

20      a closed case at all, Mr. Fisher.  I think it's pretty

21      clear that Mr. Munafo's motive was to call and harass a

22      law enforcement agency and employee.  And so,

23      respectfully, the objection to the scoring is overruled.

24              My calculations then are the same as the

25      presentence writers, offense level 14, criminal history

1      category four, a range for...

2              MR. KESSLER:  Your Honor, I think what

3      Ms. Bockheim was just...

4              THE COURT:  I'm sorry.

5              MR. KESSLER:  I think you may have mistakenly

6      said criminal history category four.

7              THE COURT:  Oh, I'm sorry, criminal history

8      category two.  Advisory guideline range for custody 18-24

9      months.  For supervised release, 1-3 years.  The advisory

10     range for the fine is $7,500 to 75,000.  Restitution is

11     no issue.  And we do have the $100 special assessment.

12             Now, there are a number of departure motions

13     brought by the defense, citing guidelines 5H1.3, 5C1.1,

14     and 5K2.13, and dealing with Mr. Munafo's mental and

15     emotional conditions and making the allegation or at

16     least raising the question of diminished capacity.

17             Mr. Fisher, would you like to put your

18     objections on the record for your motion, on the record

19     for those?

20             MR. FISHER:  Your Honor, I should clarify.  I

21     did not file a separate downward departure motion in this

22     case.

23             THE COURT:  Right.

24             MR. FISHER:  Because he has already exceeded

25     the minimum guidelines that apply here by the time he is

1          served.  We are not asking for a reduction below the 18

2          months because he has already served it.  So I just put

3          these in for the policy position that they stand for.

4          Obviously, I think that Mr. Munafo's condition at the

5          time of offense has bearing on the sentence under both

6          the guidelines and 3553A.

7                   I think the evaluation that we've attached to

8          our sentencing memorandum, previous evaluation by the

9          Bureau of Prisons Doctoral, although not as favorable to

10         our argument, I think, also goes quite far in showing

11         that Mr. Munafo was in a heightened state of agitation

12         and not taking prescribed medication, not sleeping at and

13         near the time of this offense, all of which would support

14         the Court sentencing him at the lower range of the

15         guidelines under these policy positions rather than at

16         the higher end as the Government urges.

17                   THE COURT:  Thank you, Mr. Fisher.

18                   So we have advisory guideline ranges as

19         follows:  18-24 months incarceration.  One to three years

20         supervised release.  $7,500 to $75,000 fine.

21                   Mr. Kessler, accurate?

22                   MR. KESSLER:  Yes, Your Honor.

23                   THE COURT:  Mr. Fisher?

24                   MR. FISHER:  With our previous objection noted,

25         Your Honor, yes.

1            THE COURT:  Thank you.

2            Mr. Fisher, are you ready for your allocation?

3            MR. FISHER:  I am, Your Honor.

4            Your Honor, I will just start where I kind of

5      left off a moment ago with the policy positions that I

6      indicated in my policy statements, I've indicated for my

7      sentencing memorandum.

8            I think that Mr. Munafo's history, specifically

9      his family history, and his history of trauma and abuse

10     throughout his life have led directly to a series of

11     conditions, post-traumatic stress disorder, bipolar

12     disorder, various diagnosed mental health conditions

13     throughout his life that were not being treated

14     adequately, if at all, at the time he committed this

15     offense.  I think that goes the most to explaining why he

16     is here today.

17           At a time in his life, he spent about a year of

18     his life driving around the country with no real ties to

19     any particular graphic area, no support system

20     whatsoever, and certainly no consistent mental health

21     treatment.  It's obvious from his record that he was

22     receiving sporadic mental health treatment from his

23     teenage years until this offense was committed.

24           He -- after the offense was committed, he

25     voluntarily surrendered to Edgewater Police officers in

1       Florida.  When he was transported up here, he was also

2       not receiving adequate mental health care.  When I first

3       met him, he was similarly in a state of emotional

4       impairment and mental health impairment, which resulted

5       in him being sent to the Bureau of Prisons for an

6       evaluation.

7               He has since improved dramatically.  And I can

8       say from my interactions with him over that period of

9       time that his dedication, once we resolved the underlying

10      distrust that he had for me, his dedication to his own

11      mental health and trying new medications as they became

12      available until something really worked for him, he has

13      dramatically improved.  I can honestly say that he is not

14      the same person today that he was when he came into this

15      courtroom on the indictment or that he was when he

16      committed this offense.

17              And the surest way to achieve the purposes of

18      sentencing in this case, from my perspective, is to make

19      sure he is getting the adequate and obviously needed

20      mental health treatment that is required.  To that end, I

21      think that the Court's conditions of supervision,

22      indicating that he is required to undergo mental health

23      treatment once released from any sentence, I think is a

24      laudable requirement.

25              I'd also ask the Court, if the Court is going

1          to impose any incarceration sentence, contrary to our

2          request of the time served sentence here, that the Court

3          place him in Butner so that he can receive adequate

4          mental health treatment while there.  I think that that

5          is the best Bureau of Prisons facility for treatment for

6          mental health disorders post adjudication or

7          preadjudication for that matter.

8                    THE COURT:  I wonder, Mr. Fisher, with regard

9          to placement at Butner, whether there would even be

10         enough time to do that.  Even if I opted for the high end

11         of the guidelines, he has served more than a year, right,

12         almost a year and a half?

13                   MR. FISHER:  Almost.  It's 18 months, Your

14         Honor.

15                   THE COURT:  Yeah, I really wonder with six

16         months left there would be, given all of the

17         administrative and bureaucratic issues that the Bureau of

18         Prisons goes through, that they would even have the time

19         to get him to Butner.

20                   MR. FISHER:  I agree, Your Honor.  It's more of

21         a prophylactic measure to make sure that the record is

22         clear, that would be the intent of the Court if the

23         Bureau of Prisons does accept him.

24                    The other issue is, of course, he does have a

25         pending District of Columbia matter that is still

1      outstanding.  He has not been adjudicated on that issue

2      yet.  We would ask the Court order that he be transported

3      to the District of Columbia so that he can resume that

4      case and his defense in that case.

5              THE COURT:  Is there a warrant outstanding?

6              MR. FISHER:  He has got a detainer, Your Honor.

7      He was arrested for, I believe, both offenses at or near

8      the same time.  It's somewhat unclear to me from the

9      record who has primary jurisdiction.  But I believe it's

10     us at this point.  So he needs to go there as soon as

11     possible rather than going to Oklahoma first would be our

12     preference.

13             THE COURT:  Okay, thank you.

14             Anything further, Mr. Fisher?

15             MR. FISHER:  No, Your Honor.  I do think that

16     Mr. Munafo warrants a lower end of the sentence here.

17     This is clearly a case where mental instability played a

18     huge role in the commission of the offense.  Sentencing

19     him to additional prison time on top of that would not

20     achieve the purpose of sentencing, as outlined in the

21     statute and my sentencing memo.  Thank you.

22             THE COURT:  Thank you, Mr. Fisher.

23             Now, Mr. Munafo, I'm sure that Mr. Fisher has

24     explained to you that at this time you have the right to

25     speak in your own behalf, to tell me anything that you

1       think is important for me to know about you, about what

2       you've done, and so forth.  You don't have to speak, but

3       you have the right to do so.  So if you would like to

4       come to the podium to speak with Mr. Fisher, I'll hear

5       what you have to say; but it's up to you.

6               JONATHAN JOSHUA MUNAFO:  Thank you, Your Honor.

7       Thank you for this opportunity, Your Honor.  I'll be

8       brief.  As I've written in the PSI, a lot of what I was

9       hoping to convey to you, Your Honor, against the advice

10      of Counsel, I understand that, you know, the mental

11      health aspect of things is important to his defense.  And

12      but I can do nothing but take full accountability for my

13      actions.  And what I said, it was...I just...I don't

14      believe in excuse necessarily.  You know, my mental

15      health shouldn't disturb justice for them because what I

16      did to them was disgusting.  And I hope you have an

17      opportunity to share my letter with them somehow, the

18      victims in the case.  And I thank you for your

19      opportunity to speak.

20              THE COURT:  Well, thank you for your comments,

21      Mr. Munafo.  You may return to your seat.

22              JONATHAN JOSHUA MUNAFO:  Yes.

23              THE COURT:  Mr. Kessler, on behalf of the

24      Government?

25              MR. KESSLER:  Yes, Your Honor.  I will try to

1    be brief as well and just cover the 3553 factors.

2           As far as the nature and circumstances of the

3    offense here, it wasn't just going after one particular

4    person he had a beef with.  This was politically

5    motivated, as you can tell from him saying Insurrection

6    Act and what he did the next day.  He acknowledged

7    himself that he was putting lives in jeopardy.  It wasn't

8    just the threat to the dispatcher.  He tied up their

9    emergency dispatch line for three hours with 143 calls.

10   So he really was putting other people's lives in jeopardy

11   as well.

12          And, as is noted in the PSR, this is an

13   experienced dispatcher.  It wasn't the first one he

14   talked to.  He talked to the supervisor, the threats that

15   you heard.  And this is somebody who is used to hearing

16   things like this, hearing crazy things all day long for a

17   living.  And she was extremely upset by what happened

18   here and had to take a break.

19          The history and characteristics of the

20   offender, he has got an exceptionally long criminal

21   history.  I'm sure it's all somewhat tied up with his

22   mental health challenges.  But it's a lot of instances of

23   person-on-person violence and threats.  So it's the same

24   thing over and over again.  Mental health issues

25   definitely played into it, but it's pretty clear,

1    including from the psychiatric report from this

2    evaluation, that he knew the difference between right and

3    wrong here.

4           As far as respect for the law, his priors

5    already tell us that he didn't have much respect for the

6    law.  But you can hear it in how he is almost teasing

7    them.  This is a misdemeanor.  Ha, good luck catching me.

8    You don't know where I am.

9           And then we see what he did the next day,

10   physically assaulting law enforcement officers.  So that

11   shows a complete lack of disrespect for the law.

12          As far as deterrence, obviously, there is

13   specific deterrence that we have to think about because

14   he has done this kind of thing many times before.  But

15   the general deterrence is very important in a case like

16   this.  There is a whole media ecosystem out there that is

17   devoted to inciting this kind of behavior.  And that

18   people who are inciting it will say we didn't mean that

19   you should take us literally when you said you should

20   fight like hell, or whatever.  But people do take those

21   things literally, and this is an example of that.  And I

22   think people who might take those things literally need

23   to be put on notice that there are consequences for

24   trying to solve your political issues with violence.

25          And then, finally, protection of the public.

1      We have seen some of the other instances that are

2      reflected in the PSR.  The Defendant shoved a woman at a

3      rest stop for no reason other than looking at his car and

4      the political stickers that were on it, an instance of

5      him pummeling someone in the face.  And then there is him

6      attacking capitol police on January 6th.

7              So I think for all of those reasons a sentence

8      at the high end of the guidelines is appropriate in the

9      case, Your Honor.

10             THE COURT:  Thank you, Mr. Kessler.

11             Well, the guidelines, which we've referenced

12     here this morning, are certainly advisory.  But I do have

13     to consult them and give them consideration before

14     reaching a sentence, which is reflective of my duty to

15     impose a sentence which is sufficient but not greater

16     than necessary to comply with the purposes of Section

17     3553A.

18             Now, Mr. Kessler has gone through some of the

19     factors under the statute.  And I think it's important to

20     note them as well.  The nature and circumstances of this

21     offense show it to be really very serious.  We have

22     aggravated threats with serious claims of harm to the

23     dispatcher and who knows who else.  I have no doubt that

24     the dispatchers who talked with Mr. Munafo, and who were

25     at least in the clips that I heard, were not at all

1       defensive or off putting; but trying to discern the

2       reasons for the call so that they might provide the

3       services that they are supposed to provide.  And the fact

4       that they were or probably were most disturbed by these

5       comments is certainly understandable.

6               In looking at the history and characteristics

7       of Mr. Munafo, we have a 35-year-old single man with a

8       GED and long-term, serious mental health issues.  I read

9       through the report of the competency exam done by the

10      Bureau of Prisons.  And if even -- if what is reported

11      there is even only partially accurate, this man has

12      suffered serious abuse and neglect throughout his

13      childhood as well as sexual abuse.

14              Regardless of that, he was found to be

15      competent to face trial and is not insane.  And, frankly,

16      his comments here today really do reflect that.  And I

17      attribute that to the fact that he is now taking

18      psychotropic medication, which deals with the mental

19      health issues, which may well have, and probably did,

20      play a significant part in his behavior.  And, as pointed

21      out by Mr. Kessler, there are charges open in Washington

22      D.C. which he will have to face.

23              In looking at the purposes of sentencing, under

24      the statute, certainly they all come into play.  I think

25      there has to be not only deterrence, but in terms of

```
 1          apprising others of the consequences of this kind of
 2          action, but that there will be punishment as well, that
 3          there has to be some respect for the law, which I think
 4          Mr. Munafo was aware of that, was aware that he was
 5          disrespecting the law in the phone calls that he made.
 6          And protection of the public, the -- it's difficult to
 7          know under circumstances like these exactly what
 8          Mr. Munafo might have done had he not been found and
 9          arrested.
10               And, you know, I think, again, the criminal
11          history of Mr. Munafo shows some -- shows criminal
12          contempt, shows violence, shows weapons.  And so
13          protecting the public from someone who we have no idea
14          what will set him off is something that the Court takes
15          very, very seriously.
16               So the question then becomes whether the
17          guidelines provide the appropriate sentence under the
18          statute.  And recognizing that there's no presumption
19          that the advisory ranges are correct, I will tell you
20          that I had a very difficult time, based on my own review
21          of the whole file, in determining whether the guidelines
22          do provide an appropriate sentence.  I did consider very
23          seriously exceeding the guidelines.  And what --
24          Mr. Fisher's arguments with regard to the role of the
25          mental health issues is one that I take very seriously.
```

```
 1         But I also take very seriously whether the uncontrolled
 2     mental health issues might lead to injury to others as
 3     well as, really, to Mr. Munafo himself.
 4              But I did determine that, pursuant to the
 5     Sentencing Reform Act of 1984, that the guidelines are
 6     appropriate.  I think that, based on all of the
 7     sentencing factors, that a variance below that, down to,
 8     for instance, time served, which would get me to
 9     approximately the lower end of the advisory range, is not
10     convincing.  I think that, pursuant to the Act, the
11     sentence is for 24 months incarceration, to be followed
12     by three years of supervised release, subject to the
13     standard conditions of reporting and remaining law
14     abiding.
15              There are some additional sentencing
16     conditions.  And we did provide an order to that effect
17     to Mr. Munafo and Mr. Fisher prior to the hearing.  And
18     they both signed it, indicating they understand it and
19     have read it.  And I'm signing it for entry.
20              The additional conditions are explained by the
21     presentence writer in Paragraph 124 of her presentence
22     report.  The fine is waived, restitution is not an issue.
23     I do order the mandatory special assessment of $100.
24              I am -- I don't know whether I can even order
25     the Bureau of Prisons to send him to Washington to face
```

1       the charges there without further detention here in

2       Michigan.  I will -- I will include that in the

3       recommendations that I make.  I will say, I will indicate

4       that Mr. Munafo should be forthwith delivered to the

5       authorities in Washington to deal with whatever charges

6       against him are there.  There is, obviously, the issue

7       of, you know, whatever happens there and then supervised

8       release here.  The Bureau of Prisons is going to have to

9       figure that out somehow.  And I don't know how they will

10      do that.

11              But in the event they don't do that, that they

12      don't take him to D.C. and that they do have some time to

13      deal with his issues, I will make the recommendation for

14      a thorough mental health evaluation and programming, for

15      vocational programming and for substance abuse

16      programming.  And, again, I think, given the relatively

17      short time that he will be here in custody, it probably

18      will not effectuate that at all.

19              Mr. Kessler, does the Government move to

20      dismiss Counts Two and Three of the Indictment?

21              MR. KESSLER:  We do, Your Honor.

22              THE COURT:  Thank you.

23              There is no -- there is no forfeiture issue

24      here.

25              Are there any legal objections to this sentence

```
 1          which I have just stated, that are not already on the

 2          record?

 3                    MR. KESSLER:  No, Your Honor.

 4                    THE COURT:  Thank you.

 5                    MR. FISHER:  Other than those already raised,

 6          Your Honor, no.

 7                    THE COURT:  Thank you.

 8                    Mr. Munafo, we have to talk about your right to

 9          appeal.  You do have the right to appeal this sentence,

10          which I've just imposed.  And there are two things that

11          you need to know about that today.  The first is that a

12          judgment is going to be entered today, and that will

13          start a 14-day period running.  What that means is that

14          in the next 14 days you have to decide if you want to

15          appeal.  You need to talk with Mr. Fisher about that.  He

16          can answer your questions.  He can tell you what your

17          options are, what the potential consequences are.  But

18          the important thing to do, for you to remember is that

19          you must tell him what you want to do, do you or do you

20          not want to appeal?

21                    The second thing for you to know is, if you do

22          wish to appeal, Mr. Fisher will continue to represent

23          you.  Do you think you understand those two things?

24                    JONATHAN JOSHUA MUNAFO:  Yes, Your Honor, I do.

25                    THE COURT:  Okay.  I do want to wish you well.
```

1          I know you've had a very, very difficult time.  And it

2          has created some real problems for you.  I hope that you

3          will continue to follow the protocols for your mental

4          health treatment.  And that you can get yourself back on

5          the right track so that when you do come back to the

6          community you will be someone who can participate

7          positively in that.

8                    With that, the Defendant is remanded to the

9          custody of the United States Marshal; and we are

10         adjourned.

11                   THE CLERK:  All rise, please.  The Court is

12         adjourned.

13                   (Adjourned at 11:50 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          STATE OF MICHIGAN)

 2                          ) ss

 3          COUNTY OF KENT   )

 4

 5                    I, Annette R. Blough, CRC/CRR/RPR/CSR-5191,

 6          do hereby certify that I reported the foregoing

 7          proceedings before the JANET T. NEFF, JUDGE of the United

 8          States District Court, Western District of Michigan,

 9          Grand Rapids, Michigan; that the same was reduced to

10          typewritten form, and that the attached 37 pages

11          constitute a full, true and accurate transcript.

12                    IN WITNESS WHEREOF, I have hereunto set my

13          hand this 8th day of November, 2022.

14

15

           _____
16          Annette R. Blough, CRC/CRR/RPR/CSR-5191 and Notary
            Public, Ottawa County, acting in Kent County, Michigan.
17          My Commission expires 1-17-2027

18

19

20

21

22

23

24

25
```